IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 21, 2010

**TONY E. CANNON, JR. v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Lincoln County**
**No. S0900008    Robert Crigler, Judge**

_____

**No. M2009-01835-CCA-R3-PC - Filed September 15, 2010**

_____

A Lincoln County jury convicted the Petitioner, Tony E.Cannon, Jr., of attempted second degree murder, aggravated assault, and felony reckless endangerment, and the trial court imposed an effective sentence of twelve years. On direct appeal, this Court affirmed the Petitioner's convictions and sentence. *State v. Tony E. Cannon, Jr.*, No. M2007-00557-CCA-R3-CD, 2008 WL 2448341, at *1 (Tenn. Crim. App., at Nashville, June 18, 2008), *no Tenn. R. App. P. 11 application filed*. The Petitioner then filed a petition for post-conviction relief in which he alleged that he received the ineffective assistance of counsel. After a hearing, the post-conviction court dismissed the petition. On appeal, the Petitioner contends the post-conviction court erred when it dismissed his petition. After a thorough review of the record and applicable authorities, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

S. Craig Moore, Fayetteville, Tennessee, for the Appellant, Tony E. Cannon, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Lacy Wilber, Assistant Attorney General; Charles F. Crawford, Jr., District Attorney General, Ann L. Filer, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Background**

In our opinion in the Petitioner's direct appeal, we recited the facts supporting his

convictions as follows:

The events giving rise to the convictions in this case occurred on June 18, 2006, in Fayetteville, Tennessee. The victim, Trenton Dixon, testified that on that day he attended a barbecue in a field next to an abandoned house and then went "riding around" with friends. After a while, the victim became tired and decided to go spend the night with a friend in Huntsville. Before leaving, he parked his car on Robertson Street and went to say goodbye to some of his friends. As he approached the brown house where Randall McClure lived, he saw the defendant and "more than three or four" people, including Kendrick Thomas and Rafael Ford, standing on the porch. At that point, the defendant, whom the victim knew as "Big Man," "came off of the porch . . . straight to [him], like, man don't come down here with that." The victim claimed that he was confused by the defendant's behavior because the two had parted on pleasant terms a few days earlier. The victim became more confused when the defendant said, "Don't come down here, you and Rio, with that shit." The victim explained, "I don't know why. I was all by myself." When the victim asked the defendant what he was talking about, the defendant repeated, "Don't come down here. I am telling you today ain't the day." The victim stated that "[e]ventually what I got from [the defendant] was for some reason he thought I came down there between whatever him and Rio had going on." The victim explained that "Rio" was Mario Porter, the individual who had hosted the barbecue earlier that day. He stated that he knew Mr. Porter because he worked for the victim's aunt.

The victim recalled that the defendant brandished a handgun during the encounter, and the victim raised his shirt to show that he was not armed. The victim told the defendant, "Chill out. I didn't come down for this man." The defendant "kept on saying what he was saying." At that point, the victim said, "[D]o what you have got to do" and started to walk away, and the defendant shot him twice. The victim recalled that he felt as if his "stomach was on fire" and that "[o]n a scale of one to ten I would say [the pain was] a ten." He fell to the ground and tried to get up but was unable to do so. After the shooting, "[e]verybody scattered. I was left there crawling, trying to get somewhere." After about 30 seconds, an individual named Jason came over and talked to the victim until the ambulance arrived.

The victim was taken by helicopter to Huntsville Hospital where he underwent surgery to remove the bullets and repair the damage to his internal organs. The victim recalled that he lost six inches of his small intestine and

-2-

that the doctors had to "rebuild [his] digestive tract."  The victim remained in the hospital for a week.  The victim stated that a piece of one of the bullets could not be removed and that he has a permanent "twitch" that his doctor attributed to "nerves."

During cross-examination, the victim denied that there was bad blood between him and the defendant prior to the shooting.  The victim acknowledged that he did not see the defendant fire the first shot but insisted that he had seen the defendant fire the second shot.

Laurel Petty testified that she had known the defendant "[s]ince he was a little child" and the victim "[a] good while."  Ms. Petty, who lived across the street from the brown house, was sitting on her porch enjoying the sunny day and the company of a neighbor when she heard the defendant, whom she knew as "Big Man," and the victim "fussing" "in the yard . . . [o]f the brown house."  She saw the defendant shoot the victim twice.  After the shooting, Ms. Petty went inside her home and did not talk to the authorities.  Three days later, she went to the police station and told Detective Eubanks what she had seen.  She identified the defendant from a photographic lineup.

During cross-examination, Ms. Petty acknowledged that she took medication for schizophrenia but stated that she had taken her medication on the day of the shooting and was experiencing no problems with her mental health at that time.  She insisted that she had a clear view of the shooting and saw the entire event unfold as she sat on her porch.  Ms. Petty offered little in the way of explanation for her delay in contacting the police.

Fayetteville Police Department Detective Adam Eubanks testified that he responded to the scene of the shooting and saw the victim "lying on the edge of the driveway" and "yelling that he had been shot."  Detective Eubanks tried to talk with the victim at that time, but the victim "was in a lot of pain and really didn't want to talk."  Despite interviewing a number of people who were present at the scene, Detective Eubanks gleaned no information about the identity of the shooter.  He explained, "I was told everything from 'I didn't see anything' to '[Y]es, I saw something but I am not telling you.'"  Three days later, Ms. Petty came to the police station and identified the defendant as the perpetrator of the shooting.  Although Ms. Petty knew the defendant only as "Big Man," Detective Eubanks was familiar with the alias and created a photographic array that included the defendant's photograph.  According to Detective Eubanks, Ms. Petty immediately identified the defendant as "Big

-3-

Man" and showed no hesitation in her identification. The next day, Detective Eubanks visited the victim in the hospital, and the victim provided a statement identifying the defendant as the person who shot him.

Lincoln County Emergency Medical Services worker Joseph Stringfield treated the victim at the scene. According to Mr. Stringfield, the victim stated that he did not know who shot him. On cross-examination by the State, Mr. Stringfield stated that the victim "had two penetrating injuries which confirmed [sic] to be gunshots to the . . . right lower flank region of his back. He was very anxious, in pain."

Rafael Ford, Kendrick Thomas, and Maurice Kelso also testified on behalf of the defendant. Each denied being present when the victim was shot.

At the conclusion of the trial, the jury convicted the defendant of the attempted second degree murder of the victim, the aggravated assault of the victim, and felony reckless endangerment. The trial court ordered that the conviction for aggravated assault be merged into the conviction for attempted second degree murder.

*Cannon*, 2008 WL 2448341, at *1-3.

The trial court sentenced the Petitioner to twelve years for the attempted second degree murder conviction, the maximum sentence within his range. The trial court sentenced the Petitioner to two years for his felony reckless endangerment conviction and ordered that the two-year sentence run concurrently with the Petitioner's twelve-year sentence. The Petitioner's convictions and sentences were affirmed on direct appeal. *See Cannon*, 2008 WL 2448341, at *1.

## B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief, which he later amended, alleging that he received the ineffective assistance of counsel because his trial counsel: (1) was not prepared for trial; (2) failed to introduce evidence supporting the Petitioner's alibi defense; and (3) failed to raise as issues on appeal the State's opening and closing statements, which, in the Petitioner's view, were improper.

At the hearing on his petition, the Petitioner's post- conviction attorney told the court that a process server had attempted to serve Jackie Cannon, the Petitioner's alibi witness, with a subpoena for the hearing on at least four occasions. The attorney acknowledged that

-4-

the post-conviction court had already granted the Petitioner one continuance based on Jackie Cannon's failure to appear. The Petitioner's post-conviction attorney did not request another continuance, and the following evidence was presented: the Petitioner testified that his trial counsel ("Counsel") was first appointed to his case at his arraignment, where the two spoke for a few minutes. The Petitioner recalled that he "acted up" in court and was transferred to the Special Needs department of prison to be evaluated. The Petitioner said he saw Counsel only one other time after their first meeting and one other time the week before trial.

The Petitioner testified he was only able to call Counsel one time because prison personnel denied him his "legal call." He said he did not have any stamps, so he did not contact Counsel by mail. The Petitioner filed complaints against Counsel with the Tennessee Board of Professional Responsibility, and the Board told him that they could not appoint him another attorney but said they would contact Counsel about the complaints. The Petitioner said he also wrote Counsel a letter informing Counsel that he had complained to the Board, and Counsel then wrote him a letter in response. The Petitioner testified he asked Counsel, through the prison legal assistance, about requesting the victim's medical records and about moving for a change of venue. The Petitioner said Counsel never showed him any paperwork, including a request by the State for any potential alibi witnesses and any discovery requests.

The Petitioner said he was in Pulaski, Tennessee, at the time of this crime with his aunt, Jackie Cannon, where he recalled he was "grilling out," "smoking marijuana," and "chilling." The Petitioner recalled he had been released from jail for five days before the shooting in this case occurred, and he was on Community Corrections. The Petitioner said he was supposed to report to his probation officer but did not because he was smoking marijuana. He knew his probation officer was going to issue a probation violation warrant for his arrest.

The Petitioner maintained that he never went to Fayetteville, Tennessee, on the day of the shooting. He explained that he had recently been shot in Fayetteville and was, therefore, avoiding the city. He said he did not see who shot him but said someone was trying to pressure him to say that a man named "Dayne" shot him. The Petitioner said he told Counsel he was in Pulaski on the day of the shooting.

The Petitioner complained that Counsel did not impeach the victim, Trent Dixon, with Dixon's testimony from the preliminary hearing. The Petitioner also complained that Counsel did not object to the State's opening and closing statements, which he alleged were improper. Finally, the Petitioner stated that Counsel should have argued that Lora Lee Petty, a State witness, was not mentally fit to testify.

On cross-examination, the Petitioner testified that, on the day of his arraignment, he spoke with Counsel about the charges he faced. The two also discussed his case during the court appearance at which the State offered him a plea deal. At this court appearance, the Petitioner got into a physical altercation with some corrections officers and was sent back to prison. The Petitioner said Counsel came to visit him at the special needs facility in prison where the Petitioner was located. The Petitioner testified that Counsel asked him to communicate with him via mail, but the Petitioner complained that he did not have any stamps and could not write Counsel. The Petitioner then acknowledged that he was able to mail some letters to Counsel.

The Petitioner conceded he had a reputation for having anger issues. The Petitioner complained that his trial lasted only "an hour or two," which he felt was too short given the gravity of the charges he faced.

The Petitioner said he went to another inmate, considered a "jailhouse lawyer," for assistance with his case. He told the other inmate that he wanted a change of venue because he felt he would not get a fair trial. He said that, because he had "disrespected the Judge's house" by getting into a physical confrontation with the jail administrator and spit in the administrator's face, he felt he would not receive a fair trial. The Petitioner conceded the jury was not present the day he got into the confrontation but said that the judge was present. He assumed if the venue of his trial changed then he would also receive a different judge. The Petitioner said he mentioned this to Counsel, who told him that he did not think a change of venue was necessary.

The Petitioner testified that he wanted Counsel to request the victim's medical records. He said that, while the victim displayed his scars during the trial, there was no proof that the victim did not suffer those bullet wounds on a date different from what the State alleged at the Petitioner's trial. The Petitioner conceded that there were medical personnel who testified at the trial about treating the victim on the date alleged by the State, but explained he wanted medical records to support that proof.

The Petitioner testified that he did not have transcripts of the opening and closing statements for his direct appeal. The Petitioner felt the State's arguments were improper because the State attempted to incorrectly portray him as dangerous and the victim as innocent. He felt the jury convicted him, in part, because he had "gold teeth in [his] mouth."

The Petitioner said he told Counsel he was at Jackie Cannon's house, but he did not ask for her to be subpoenaed to court because he had heard that she had turned into a "snitch." The Petitioner said he did not "deal with th[ose] type of people," so he did not want to talk to Jackie Cannon. The Petitioner said his cousin Kesha Cannon was also present

when he was at Jackie Cannon's house. He agreed that neither Jackie Cannon nor Kesha Cannon had appeared for the post-conviction hearing, and he said he had not spoken to either in three years.

The Petitioner agreed that he had previously been adjudicated guilty of crimes he committed as a juvenile. Further, he agreed that he had been convicted of assault on multiple occasions. He said he also had a felony cocaine conviction. The Petitioner conceded that, after he went to prison, he got into a physical confrontation with police at the prison. He said they "smacked" him on the way to the "hold" and he "knocked their teeth out." For this, he received two years in the hold, which he completed three months before the post-conviction hearing. The Petitioner agreed he had a "problem with authority." He said, though, he had not had a write-up from prison officials in more than two years.

Counsel testified he had defended numerous criminal cases, including multiple first degree murder cases, some of which involved the death penalty. He recalled being appointed to the Petitioner's case soon after the Petitioner was arraigned. Counsel had detailed notes from his first conversation with the Petitioner, which included that the Petitioner said he was with his girlfriend until 11:00 a.m. the morning of the shooting and then again after around 7:00 p.m. The shooting in this case happened around 6:00 p.m. The Petitioner did not tell Counsel about being at Jackie Cannon's house during the time of the shooting. Counsel testified that the first he heard about the Petitioner claiming he was at Cannon's house was in the amendment to the post-conviction petition. Counsel testified that, because he knew Jackie Cannon, he was confident he would have recalled any mention by the Petitioner of being at her house. Similarly, the Petitioner never mentioned to Counsel that Kesha Cannon was a potential alibi witness.

Counsel listed each time met with the Petitioner and every time he contacted the Petitioner by mail or by telephone. He said he first met with the Petitioner on July 25, 2006, when they discussed the Petitioner's case, including that the Petitioner thought a "Mario Porter" committed this shooting. He then sent the Petitioner the motions he had filed on the Petitioner's behalf on August 11, 2006. The two met on August 22, 2006, a court date, when, according to Counsel's detailed notes, the two discussed several aspects of the Petitioner's case. Counsel recalled the Petitioner was adamant that he was not involved in the shooting, so he was not receptive to pleading guilty. The Petitioner provided Counsel with his step-mother's contact information, so Counsel could contact her for information about this case.

Counsel received a letter from the Petitioner on August 29, 2006, in which the Petitioner reiterated that he did not commit this crime and stated that Mario Porter had a gun the day of the shooting. In the letter, the Petitioner expressed his desire to only plead guilty

if he did not receive any prison time.

Counsel met with the Petitioner on September 19, 2006, when Counsel gave the Petitioner all of the discovery he had received from the State and a transcript of the Petitioner's preliminary hearing. The Petitioner said he did not want to plead guilty unless he would receive less than three years. Counsel's notes reflect that the State's position was that any time the Petitioner received would have to run consecutively to his previous eight-year probation sentence, which likely was going to be revoked.

Counsel received a letter from the Petitioner on September 29, 2006, in which the Petitioner said he wanted to "settle" his case rather than go to trial. The Petitioner also asked Counsel to move up his court date. Counsel wrote a letter to the Petitioner the following day, explaining to him that the Petitioner and the State were not close to agreeing on terms for a plea deal. He went over the State's offers and then told the Petitioner he would attempt to move the Petitioner's trial to an earlier date. He also outlined for the Petitioner his range of punishment on each of the three charges he faced. Counsel included several documents with this letter, including a copy of the State's plea offer; a copy of the indictment; a copy of pretrial motions Counsel filed; a copy of the State's discovery response; a witness list; and a supplemental witness list.

Counsel received a letter from the Petitioner on October 6, 2006, in which the Petitioner told Counsel he was not happy with the State's offer of ten years in exchange for his plea of guilty. The Petitioner told Counsel the deal he was willing to make with the State and said, if the State did not agree, he wanted to go forward with his trial. A week later, Counsel received another letter from the Petitioner in which he told Counsel he would not agree to a plea deal that included any prison time. If the State asked for him to serve any time, he wanted to go forward with his trial. He told Counsel not to send him any offers that included prison time.

Several weeks later, on November 21, 2006, Counsel met with the Petitioner during a hearing related to the the Petitioner's case.
On December 8, 2006, Counsel received a letter and a phone call from the Petitioner. Counsel's records indicated that he and the Petitioner spoke on the phone for thirty minutes, the maximum time the prison allowed inmates to use the phone. The letter Counsel received that same day directed Counsel to withdraw from his case and said "a lot of not very nice things."

Counsel was in the process of responding to the Petitioner's letter when he received another letter from the Petitioner indicating that TDOC was limiting his ability to call Counsel, that TDOC was mistreating him, that he wanted to be transferred back to jail, that

he was not getting visits from his family or girlfriend, that he wanted to settle his case, and that the case against him was "bogus." Counsel told the Petitioner he would visit him in prison on Wednesday, December 13, 2006. Counsel attempted to do so, but the prison told him that it had instituted a policy preventing attorneys from visiting on Wednesday clients housed where the Petitioner was housed. Counsel successfully visited the Petitioner in prison on December 29, 2006, and the two met and discussed the Petitioner's case for two hours, talking at length about potential witnesses. That same day, he conducted some field investigation on the Petitioner's case, including obtaining Trent Dixon's criminal history, visiting Deberry Special Needs facility, speaking with the Petitioner's former girlfriend, Ebony, speaking with the EMS responders, and speaking with the assistant district attorney about the medical proof and Brady issues. Counsel also spoke with the assistant district attorney about settling the Petitioner's case, but that conversation was unproductive.

Counsel said that he tracked down the potential witnesses he and the Petitioner discussed, and many of them said they were not present during the shooting. This aided the Petitioner's defense because the victim had identified these witnesses as present during the shooting. Therefore, Counsel subpoenaed these witnesses to tell the jury that they were not present, contradicting the victim's story. Counsel said he and the Petitioner did not discuss an alibi defense.

While unsure, Counsel believed his notes indicated that the Petitioner told him that he was present at the shooting but that he did not have a gun at the time. The Petitioner identified other individuals who were present and who were carrying guns at the time.

Counsel testified he was next in court on the Petitioner's case on January 2, 2007, but the Petitioner was not present. Before trial, Counsel went to see Perry, a key State witness, and the two discussed what Perry had seen at the time of the shooting. Then, on January 10, 2007, he went to Deberry to meet with the Petitioner in prison, and the two discussed Counsel's meeting with Perry and some final trial preparations. The Petitioner, who Counsel's notes reflect "rant[ed] a lot," said anyone could have paid off Perry to identify him as the shooter. The Petitioner said the lead police detective was encouraging his prosecution because the Petitioner refused to identify his own shooter in a previous case. Counsel said that, on January 13, 2007, he did further investigation of this case, taking photographs and meeting with the Petitioner's stepmother and several other witnesses. Counsel identified a "to do" list in his file from the Petitioner's case and noted specifically that there was no mention of Jackie Cannon as an alibi witness. He said an alibi was not something that he and the Petitioner ever discussed.

Counsel testified that, after the Petitioner's trial, the Petitioner wrote him a letter asking how long his appeal would take and asking why Counsel had not been in contact with

him. In a response letter, Counsel outlined his contact with the Petitioner and gave the Petitioner an estimate of how long the appellate process would take. Counsel said he did not request a transcript of the opening and closing statements. He said he did not recall any problems with either the opening or the closing arguments and said he would have objected at the time if there was a problem.

On cross-examination, Counsel testified that the Petitioner always maintained his innocence in this shooting. Counsel identified the transcript of the preliminary hearing where the victim testified that he was shot in the back and did not see who shot him. Counsel said he brought to the Petitioner's trial a copy of the preliminary hearing transcript and an audio recording of that proceeding. He said he did not impeach the victim with this statement because he did not recall the victim testifying in a way contradictory to this. Counsel then identified the trial transcript wherein the victim testified the Petitioner was walking backwards as he shot the victim. Counsel then asked the victim whether he recalled testifying at the preliminary hearing that he had not seen the Petitioner shoot him, and the victim gave "no audible response." Counsel assumed the victim's answer was "yes," which prevented Counsel from admitting the preliminary hearing transcript.

Counsel then clarified that, upon further examination of his notes, he did not believe that the Petitioner ever told him that he was present at the scene of the shooting. He thought that his notes on that point were actually notes from when he interviewed Perry, a witness for the State, about what she had seen the night of the shooting. He reiterated that the Petitioner told him that he was with his girlfriend until 11:00 a.m. the morning of the shooting and then again after around 7:00 p.m.

Based upon this evidence, the post-conviction court issued findings of fact and conclusions of law and dismissed the Petitioner's petition for post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends he received the ineffective assistance of counsel because his trial counsel: (1) was not prepared for trial; (2) failed to introduce evidence supporting the Petitioner's alibi defense; and (3) failed to raise as issues on appeal the State's opening and closing statements, which, in the Petitioner's view, were improper.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. §

40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim of ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753

S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n. 38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

### A. Trial Preparation

The Petitioner first contends that Counsel was ineffective because he met with him only "about twice," the two men spoke on the phone only once, and his letters to Counsel went unanswered. Further, he asserts that Counsel was ineffective for not obtaining the victim's medical records regarding the shooting. The State counters that the record supports that Counsel met with the Petitioner on numerous occasions and communicated with him by telephone and by letter. Further, the State asserts, the record supports that Counsel was adequately prepared for trial.

The post-conviction court found:

Trial counsel had thoroughly investigated and prepared this case. As to the

-12-

[Petitioner's] complaints as to counsel's performance at trial, the post-conviction court finds the [Petitioner's] complaints as to counsel's performance at trial completely unfounded. Contrary to the [Petitioner's] assertions, counsel crossed the victim regarding whether he saw the Defendant shoot him and crossed witness Laurel Petty regarding her medical condition. Cross of both witnesses was thorough and effective, as was his cross of Lincoln County Emergency Medical Services worker, Joseph Stringfield. Furthermore, counsel called three witnesses who contradicted the victim's testimony that they were present when the [Petitioner] shot him. Counsel's defense that the State's proof fell short of proof beyond a reasonable doubt was the appropriate strategy and counsel ably pursued it. Counsel is not to be faulted because the jury convicted the [Petitioner]. . . .

We conclude the evidence does not preponderate against the post-conviction court's findings. *See Fields*, 40 S.W.3d at 456-57. Counsel kept detailed records and notes about his meetings with the Petitioner in the Petitioner's file. Those records indicated that Counsel met with the Petitioner on several occasions, including, but not limited to: July 25, 2006, (Petitioner said Mario Porter committed shooting); August 22, 2006, (discussed several aspects of the Petitioner's case, Petitioner was adamant he was not involved in the shooting, and Petitioner provided step-mother's contact information); September 19, 2006, (Counsel gave the Petitioner all of the discovery he had received from the State and a transcription of the Petitioner's preliminary hearing, and the two discussed pleading guilty); November 21, 2006, (Counsel was in court on the Petitioner's case, and the two of them met together); December 29, 2006, (the two met in prison and discussed the Petitioner's case for two hours, talking at length about potential witnesses); January 10, 2007, (Counsel met with the Petitioner at Deberry Special Needs Facility, and the two discussed Counsel's meeting with Perry and some final trial preparations).

Counsel additionally testified about two phone conversations he had with the Petitioner, both of which he documented in his file. Counsel identified multiple letters he received from the Petitioner, all of which were in his file, and multiple letters he sent back to the Petitioner, copies of which were in the Petitioner's file. Counsel's notes reflect that he and the Petitioner thoroughly and adequately discussed the facts of this case and that Counsel investigated the evidence: interviewing Perry on two occasions, interviewing other witnesses, securing witnesses' presence at the Petitioner's trial, and effectively cross-examining witnesses. Under these circumstances, we conclude that the Petitioner has clearly not shown that Counsel's performance was, in any way, deficient. *Strickland*, 466 U.S. at 690. The Petitioner is not entitled to relief on this issue.

**B. Production of Evidence Supporting Alibi Defense**

The Petitioner next contends that Counsel was ineffective for failing to call his alibi witnesses, Jackie Cannon and Kesha Cannon, to testify. He states that he informed Counsel of these witnesses but that Counsel failed to call them. The State counters that the record supports that the Petitioner never informed Counsel of these alibi witnesses. The post-conviction court found:

> The post-conviction court accredits [Counsel's] testimony that the [Petitioner] never mentioned Jackie Cannon, Kesha Cannon or an alibi defense until the [Petitioner] raised them in this post-conviction proceeding. Neither Jackie Cannon nor Kesha Cannon testified at the post-conviction hearing. It is very well settled that when a petitioner claims that counsel did not interview or call a witness at trial, that witness should be presented by the petitioenr at the evidentiary post-conviction hearing. *Black v. State*, 794 S.W.2d 752-757 (Tenn. Crim. App. 1990).

We conclude the evidence supports the post-conviction court's findings. *See Fields*, 40 S.W.3d at 456-57. Counsel testified that he was independently familiar with Jackie Cannon and that he would have, therefore, recalled if the Petitioner had mentioned her as an alibi witness. He said that there was no indication in his notes that the Petitioner mentioned an alibi witness and that he would have pursued any mention of such a witness. We have found nothing in the record to contradict the trial court's finding that Counsel's testimony on this issue was credible and, as the trial court adeptly noted, neither alleged alibi witness testified at the post-conviction hearing. We conclude, therefore, that Counsel did not fail to obtain the testimony of any potential alibi witness. *See House*, 44 S.W.3d at 515. The Defendant is not entitled to relief on this issue.

**C. Failure to Raise on Appeal Issues of Improper Opening and Closing Statements**

The Petitioner next contends that Counsel was ineffective for failing to raise on appeal the issues of allegedly improper remarks made by the assistant district attorney during opening and closing statements. Specifically, he contests the State's remarks about the elderly age of witness Laurel Perry and its references to the victim's youth. The State counters that the State's arguments were relevant and not inflammatory. The post-conviction court found, "Neither the [Petitioner's] testimony nor Exhibit [One] establish improper opening and closing. Both were relevant to the issues being tried and based upon the evidence in the case; to wit: that the [Petitioner], essentially unprovoked, shot the unarmed victim in the back twice."

-14-

After reading the opening and closing statements of the State in their entirety, we conclude the evidence does not preponderate against the post-conviction court's findings. *See Fields*, 40 S.W.3d at 456-57. As found by the post-conviction court, the arguments were relevant and discussed the issues before the jury. Counsel testified that he did not recall any problems with the opening and closing statements and that he would have immediately objected had the State made improper argument. We conclude that Counsel was not ineffective for failing to raise on appeal any issues concerning remarks made by the State in opening and closing statements and that the Petitioner is not entitled to relief on this issue. *House*, 44 S.W.3d at 515.

### III.  Conclusion

After a thorough review of the record and the applicable authorities, we affirm the judgment of the post-conviction court.

_____

ROBERT W. WEDEMEYER, JUDGE